UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH M. CORLETT,

       Plaintiff,

v.                                       Case No. 13-11145
                                              Honorable Patrick J. Duggan

OAKLAND UNIVERSITY BOARD
OF TRUSTEES, GARY RUSSI, in his
individual and official capacity as the President
of Oakland University, MARY BETH SNYDER,
in her individual and official capacity as
Vice President for Student Affairs and Enrollment
Management of Oakland University,

       Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

> Justice Sutherland taught us that a "nuisance may be merely a right thing in the wrong place,– like a pig in the parlor instead of the barnyard." *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388, 47 S. Ct. 114, 118, 71 L.Ed. 303 (1926). Vulgar language, like vulgar animals, may be acceptable in some contexts and intolerable in others. *See FCC v. Pacific Foundation*, 438 U.S. 726, 750, 98 S. Ct. 3026, 3041, 57 L.Ed.2d 1073 (1978). Indeed, even ordinary, inoffensive speech may be wholly unacceptable in some settings. . . .

*Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 696, 106 S. Ct. 3159, 3171

(1986) (Marshall, J., dissenting). When Plaintiff referred to his Oakland

University English professor as "stacked" and graphically compared her to a

sitcom character he fetishized in a writing assignment, he brought a pig into the parlor. Such expressions, while possibly appropriate in some settings, need not be tolerated by university officials. Therefore, and for the additional reasons set forth herein, the Court is granting Defendants' motion to dismiss Plaintiff's Complaint.

## I.   Introduction

On March 15, 2013, Plaintiff initiated this action claiming that his federal constitutional rights were violated when Defendants disciplined him in response to writings he submitted for his English course at Oakland University ("OU"). Specifically, in his Complaint Plaintiff asserts that Defendants: (1) retaliated against him for constitutionally protected speech in violation of the First Amendment; (2) treated him differently than similarly situated students in violation of his Equal Protection rights under the Fourteenth Amendment; (3) maintain an "Unlawful Individual Activities" policy that is vague and therefore violates the First Amendment and Fourteenth Amendment's Due Process Clause; (4) engaged in viewpoint discrimination in violation of the First Amendment by applying the Unlawful Individual Activities policy to his speech; and (5) maintain and applied an over-broad Unlawful Individual Activities policy to his activities. For relief, Plaintiff seeks (1) a declaratory judgment stating that OU's Unlawful Individual Activities Policy is facially and as-applied unconstitutional; (2) preliminary and

2

permanent injunctions restraining Defendants' enforcement of the policy; (3) a declaratory judgment that Defendants' disciplinary proceedings against Plaintiff violated his rights under the First and Fourteenth Amendments;[1] (4) an order requiring Defendants to expunge any and all mention of the disciplinary investigation and proceedings against Plaintiff from school records; (5) a preliminary and permanent injunction requiring OU to grant Plaintiff the credit and a grade for the English course; (6) compensatory damages in the amount of $2,200,000.00; (7) exemplary or punitive damages; and (8) fees, costs, and interest.

Presently before the Court is Defendants' motion to dismiss the Complaint, filed pursuant to Federal Rule of Civil Procedure 12(b)(6) on April 30, 2013.  In accordance with a stipulation reached by the parties, Plaintiff filed a response to the motion on May 31, 2013 and Defendants filed a reply brief on June 14, 2013. The Court held a motion hearing on July 9, 2013.

---

[1]Notably, Plaintiff does not allege that his procedural due process rights were violated with respect to the disciplinary process.

3

## II.    Applicable Standard[2]

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint.  *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).  Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . ."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007).  A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 , 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct at 1966).

---

[2]Plaintiff argues in a footnote to his response brief that Defendants assert an improper summary judgment motion at this stage of the proceedings, stating: "Although fashioned as a Motion to Dismiss, Defendants' Motion makes numerous arguments that are not about the legal sufficiency of the claims, but instead argue, as one would at summary judgment, that the claims fail as a matter of law. . . ."  (Pl.'s Resp. at 2 n.1, ECF No. 16.)  There is no difference, however, between an argument that asserts legal insufficiency and one that asserts that a claim fails as a matter of law.  Regardless of how worded, a motion (1) brought as a responsive pleading, (2) that assumes the truth of the facts alleged in the plaintiff's complaint, and (3) contends that those facts do not state the legal claims asserted, is a motion to dismiss properly brought at this stage of the proceedings under Rule 12(b)(6).

4

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Id*.; *see also Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007). This presumption, however, is not applicable to legal conclusions. *Iqbal*, 556 U.S. at 668, 129 S. Ct. at 1949. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965-66).

## III.   Factual Background

When the economy took a downturn, Plaintiff, then an almost fifty-six year

5

old, self-employed licensed residential builder, returned to school to obtain his associate and then bachelor degrees.  (Compl. ¶¶ 12-16, Ex. G at 2.)  After obtaining an associate degree from Oakland Community College in December 2010, Plaintiff pursued his bachelor degree by enrolling as a full-time student at OU in Fall 2011.  (*Id*.)  To satisfy OU's writing requirements, Plaintiff enrolled in "English 380: Advanced Critical Writing" taught by Professor Pamela Mitzelfeld ("Mitzelfeld").

Mitzelfeld provided course participants with a syllabus that outlined *inter alia* the course, student responsibilities, and course assignments.  (Compl. Ex. A.)  The latter included the submission of various individual essays and a "Writer's Daybook."  (*Id*.)  During the semester, Plaintiff wrote and submitted several essays that incorporated sexual themes, including one essay that consisted of Plaintiff's "personal recollection of several incidents involving [him] accidentally witnessing in public the brief exposure of women's breasts."  (*Id*. ¶¶ 20, 23.)  In another essay, Plaintiff writes about his flirtations with a woman karaoke singer during an evening out without his wife.  (Compl. Ex. D.)

Mitzelfeld provided students with a handout that described the "Writer's Daybook" assignment.  (*Id*. Ex. E.)  The handout generally describes the Daybook as "an ongoing volume that essentially functions as a place for a writer to try out

6

ideas and record impressions and observations.  Your Daybook will take things a

bit further by including vocabulary and reflections on passages from our readings."

(*Id*.)  The handout provides "[t]he following points" to "help [students] begin the

process" including that the Daybook should contain, but is not limited to:

    ○New vocabulary defined and used in a sentence . . .
    ○Passages of interest from each reading assignment, with an
    explanation
    ○Responses to all EE ["*The Eloquent Essay*"- on of the required
    course texts] and King [Stephen King's "*On Writing: A Memoir of the*
    *Craft*"- another required text] readings
    ○Freewriting/brainstorming for essay assignments
    ○Daybook assignments and in-class writing prompts
    ○Observation logs: People, places, etc.
    ○Creative entries of your own

(*Id*.)  Mitzelfeld advises students "that the Daybook will be randomly reviewed

three times during the semester."  (*Id*.)

      According to Plaintiff, he asked Mitzelfeld on the first day of the class

whether any topics were restricted or prohibited for the Daybook.  (Compl. ¶ 27.)

Plaintiff alleges that "Mitzelfeld emphatically replied 'no' . . . and that she wanted

the 'raw stuff' (i.e., no edits or second guessing) to be captured in the Daybook."

(*Id*.)  Plaintiff understood this response to give him leeway to write two entries, on

September 10 and 23, 2011 respectively, entitled "Hot for Teacher."  (*Id*. ¶¶ 29,

30.)

In the first entry, Plaintiff describes various teachers to whom he has felt

sexually attracted in the past, including an English instructor (not Mitzelfeld) who

he claims allowed her skirt to come unzipped and exposed her panties in class one

day.  (*Id*. Ex. F at 3.)  Plaintiff proceeds:

> Then there's Ms. Mitzelfeld.  English 380.  She walks in and I
> say to myself "Drop, motherfucker, drop."  Kee-Rist, I'll never learn a
> thing.  Tall, blond, stacked, skirt, heels, fingernails, smart, articulate,
> smile.  I'm toast but I stay.  I'll fuck up my whole Tuesday-Thursday
> class thing if I drop.  I'll search for something unattractive about her.
> No luck yet.  Shit.
>
> I'm in the student lounge an hour before class and slightly
> caffeinated.  I've had a few worries lately, the first that Lynne Anne,
> my wife, would read this.  But now I don't care.  I suppose my fear is
> a good sign that I'm writing honestly.
>
> The second worry was re-reading what I've previously written
> while drinking.  It's not as bad as I thought and I'm determined to
> keep the no-page-tear-out rule.  I swear too much when I drink.
>
> SPACE FOR YOU TO WRITE STUFF:↓

(*Id*.)  In his September 23, 2011 entry, entitled "Hot For Teacher Continued . . .",

Plaintiff begins by posing the "eternal male question": "Ginger or Maryanne?",

referring to two of the female characters in the television sitcom *Gilligan's Island*.

(Compl. Ex. G.)  As Plaintiff describes, Ginger is a "glamorous actress" and

Maryanne is "the buxom farm girl."  (*Id*.)  Plaintiff describes himself as "a Ginger

man," and then identifies Mitzelfeld as "[his] Ginger."  (*Id*.)

8

On or about November 1, 2011, with a quarter of the course remaining, Mitzelfeld collected Plaintiff's Daybook for the first time for review. (Compl. ¶ 31.) On or about November 2, 2011, Plaintiff received a telephone call from Glenn McIntosh, at the time OU's Assistant Vice President for Student Affairs and Dean of Student Life, asking Plaintiff to come to his office later that day for a meeting. (*Id.* ¶¶ 32, 33.) At the meeting, Plaintiff was advised of Mitzelfeld's discontent with some of his Daybook entries and told not to attend her English course for the remainder of the week. (*Id.* ¶ 34.) The following week, when Plaintiff heard nothing more, he believed he could resume attending Mitzelfeld's course and he did so on or about November 8, 2011. (*Id.* ¶ 36.) Mitzelfeld, however, in front of Plaintiff's classmates, summoned the OU Police Department to escort him from the classroom. (*Id.* ¶¶ 37, 38.)

McIntosh subsequently apologized to Plaintiff for not informing him that he would no longer be permitted to attend Mitzelfeld's course for the remainder of the semester. (*Id.* ¶ 39.) McIntosh also offered Plaintiff a monetary refund for the course enrollment in exchange for Plaintiff's withdrawal from the class. (*Id.* ¶ 40.) Plaintiff declined because he had completed nearly an entire semester's worth of work for the class by that time. (*Id.* ¶ 40.)

Plaintiff then turned to the Foundation for Individual Rights in Education

("FIRE").  According to a letter FIRE sent OU's President Gary Russi on

December 16, 2011, Mitzelfeld had announced to various OU officials in a

November 23 email that "she was 'officially filing a claim of sexual harassment'

against [Plaintiff] . . .."  (Compl. Ex. H at 2.)  In another email on November 29,

the FIRE letter states, Mitzelfeld indicated that Plaintiff "had 'written letters to our

school newspaper defending the right to carry concealed weapons on campus' and

that she had been 'afraid to go to the ladies restroom . . . because someone

informed [her] that [Plaintiff] was in the library.'"  (*Id*.)  According to FIRE,

Mitzelfeld stated that "'[e]ither [Plaintiff] leaves campus or I do.'"  (*Id*.)  On

December 1, Plaintiff was informed that disciplinary action was being taken

against him.  (*Id*. at 3.)

On December 7, 2011, Plaintiff met with McIntosh and OU's Vice President

for Student Affairs and Enrollment Management Mary Beth Snyder ("Snyder").

(*Id*.)  At the meeting, Plaintiff was given a letter from Snyder expressing concerns

about Plaintiff's writings about Mitzelfeld, as well as other conduct including "an

argument with student journalists, a phone call to a classmate regarding an

assignment, and sending some of his creative writing to another of his writing

10

professors."[3]  (*Id.*)

On or about January 3, 2012, Plaintiff was informed that a University

Conduct Committee hearing would be held on January 6, 2012 to address his

alleged violation of Regulation 6.02 of OU's Ordinances and Regulations, titled

"Unlawful Individual Activities" (hereafter "Regulation 6.02").  (Compl. ¶ 46.)

Regulation 6.02 reads in full:

> No person shall engage in any activity, individually or in concert with
> others, which causes or constitutes a disturbance, noise, riot,
> obstruction or disruption that obstructs or interferes with the free
> movement of persons about the campus or which interferes with the
> free, normal, and uninterrupted use of the campus for educational
> programs, business activities and related residential, food service and
> recreational activities, nor shall any person in any way intimidate,
> harass, threaten or assault any person engaged in lawful activities on
> campus.

(*Id.*)  Plaintiff reported for the January 6 hearing; however, it was postponed until

---

[3]The details of these accusations/events are not included in Plaintiff's Complaint.
Some information concerning Plaintiff's phone call to a classmate (referred to in FIRE's
letter) can be gleaned from one of Plaintiff's Daybook entries, but that entry is not
attached to the Complaint.  Instead the entry is appended to Defendants' motion to
dismiss, along with all of Plaintiff's Daybook entries.  Defendants take the position that
the Court can consider entries not attached to Plaintiff's Complaint as documents that are
referred in and central to the Complaint.  (Defs.' Mot. at 1, ECF No. 12.)  However, the
Court is not convinced that Defendants are correct with respect to these document.
Moreover, the Court's ability to decide Defendants' motion is not dependant on
information in the additional Daybook entries.  The contents of Plaintiff's entire Daybook
and the details of the other accusations/events might be relevant if the Court had to judge
the appropriateness of OU's punishment.  However, for the reasons discussed *infra*, the
Court does not find that this determination rests with it.

January 19, 2012 when it was discovered that he was not provided the required

pre-hearing notice.  (*Id*. ¶ 49.)

The hearing went forward on January 19, 2012 before five OU faculty

representatives and one student representative, with Plaintiff in attendance.  (*Id*.

¶ 51.)  The hearing board eventually determined that Plaintiff had violated

Regulation 6.02 and issued the following sanctions:

> •University Disciplinary Suspension for Winter, Summer, and Fall
> 2012 semesters;
> •Not accepting as transfer credit any credit earned during the
> suspension period;
> •deeming Plaintiff "*persona non grata*" on campus during the
> suspension period, meaning that he was restricted from entering the
> entire OU campus or being subject to arrest for criminal trespass;
> •Placing him on University Disciplinary Probation for the duration of
> his attendance at OU;
> •Deferring his Winter 2013 suspension (i.e., he could enroll and
> participate in Winter 2013 classes with the presentation of evidence
> that he participated in counseling for sensitivity issues); and
> •Barring Plaintiff from having contact with Mitzelfeld or taking any
> courses from her during the duration of his attendance at OU.

(*Id*. ¶ 58, Ex. L.)  Plaintiff filed an appeal, which Snyder denied on or about March

5, 2012.  (*Id*. ¶¶ 59, 60, Exs. M, N.)  This lawsuit followed.

## IV.   Defendants' Arguments and Plaintiff's Response

In their motion to dismiss, Defendants group Plaintiff's five claims into two

categories: (1) those claims that are based on the allegation that Defendants

12

violated Plaintiff's right to free speech (Counts I, II, and IV) and (2) those claims that challenge Regulation 6.02 (Counts III and V). Defendants argue that under the "curricular speech doctrine" discussed by the Supreme Court in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S. Ct. 562 (1988), and by the Sixth Circuit in *Ward v. Polite*, 667 F.3d 727 (2012), Plaintiff's Daybook entries are entitled "to slim protection" which was "negated because Defendants had a legitimate educational and pedagogical bases for restricting and punishing [that speech]." (Defs.' Mot. ¶ 3.) Defendants contend that Regulation 6.02 is neither overly-broad nor vague. Defendants alternatively argue that the individual defendants are immune from suit under the qualified immunity doctrine.

Plaintiff argues in response that the curricular speech doctrine does not apply to the circumstances of this case, and that the applicable standard is the "substantial disruption" test set forth by the Supreme Court in *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 89 S. Ct. 733 (1969). Plaintiff contends that there was no indication that his Daybook entries threatened such a disruption to the functioning of OU and thus his free speech rights were violated in the manners alleged. Plaintiff also argues that Regulation 6.02 is over-broad and vague, as evidenced by its unlawful application to his free speech. With respect to Defendants' qualified immunity argument, Plaintiff contends that it was clearly

13

established that students retain free speech rights in the university setting and that the contents of his Daybook entries "do[] not remotely implicate the types of speech that the Supreme Court has determined do not fall under the First Amendment."  (Pl.'s Resp. Br. at 18, ECF No. 16.)  In a footnote, Plaintiff lists the "few, narrow, and well-settled" types of speech the Supreme Court has found not protected by the First Amendment: obscenity, defamation, commercial fraud, incitement, true threats of violence, fighting words, and child pornography.  (*Id.* at 18-19 n.6, citations omitted.)

## V.    Applicable Law and Analysis

Aside from Plaintiff's claims that Regulation 6.02 in and of itself is vague and over-broad (i.e. as written rather than as applied to his conduct), the success of his claims is dependent upon a finding that he engaged in protected speech.

### A.    First Amendment Protection in the School Context

As this Court remarked recently when addressing another free speech case arising in a school setting, tension exists between the rights of students to engage in free speech as protected by the First Amendment and the interests and responsibilities of schools to provide "a safe atmosphere conducive to learning." *See Glowacki v. Howell Pub. Sch. Dist.*, No. 2:11-cv-15481, 2013 WL 3148272, at *1 (E.D. Mich. June 19, 2013) (unpublished op.).  Another district court analyzing

14

a Ohio University student's free speech claims recently summarized this tension

and some of the applicable case law as follows:

> The United States Court of Appeals for the Sixth Circuit has
> recognized that freedom of speech claims in school settings "implicate
> two strands of law that occasionally run into each other." *Ward v.
> Polite*, 667 F.3d 727, 732 (6th Cir. 2012). On the one hand, "public
> schools are not expression-free enclaves." *Id*. Accordingly, to
> regulate speech because it occurs on school grounds school officials
> must "reasonably forecast[] that such displays could cause substantial
> disruption or materially interfere with the learning environment."
> *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 335 (6th Cir. 2010) (citing
> *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514, 89
> S. Ct. 733, 21 L.Ed.2d 731 (1969)). "Moreover, "the free-speech
> clause generally prohibits suppressing speech because of its message,
> and the Court has enforced that prohibition in the public school–
> indeed the university– setting." *Ward*, 667 F.3d at 733 (internal
> quotations omitted).
>
> On the other hand, "a school need not tolerate student speech
> that is inconsistent with its basic educational mission . . .."
> *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S. Ct. 562,
> 98 L.Ed.2d 592 (1988) . . . Relatedly, "universities have considerable
> authority to control their own speech." *Ward*, 667 F.3d at 732.
> "Foremost among a school's speech is its selection and
> implementation of a curriculum– the lessons students need to
> understand and the best way to impart those lessons– and public
> schools have broad discretion in making these choices." *Id*.
> Accordingly, "public educators may limit 'student speech in school-
> sponsored expressive activities so long as their actions are reasonably
> related to legitimate pedagogical concerns.'" *Id*. at 733 (quoting
> *Hazelwood*, 484 U.S. at 273).

*Winkle v. Ruggieri*, No. 2:12-cv-01079, 2013 WL 230136, at *4 (S.D. Ohio Jan.

22, 2013) (unpublished op.) (brackets omitted). In short, the leeway granted

15

educators to curtail speech within the school gates depends on the content of the student's speech and the context surrounding its making.

One scenario arises where expressions of opinion happen to occur within the school gates, as presented in *Tinker*.  In *Tinker*, students were suspended for wearing black armbands in protest of the Vietnam War.  The Court specifically noted what the case did and did not involve:

> The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style or deportment. . . . It does not concern aggressive, disruptive action or even group demonstrations. Our problem involves direct, primary First Amendment rights akin to "pure speech."

*Tinker*, 393 U.S. at 507-08, 89 S. Ct. at 737 (internal citations omitted).  To justify the prohibition of a particular expression of opinion, the Court held that the school must "show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."  *Id*. at 509, 89 S. Ct. at 738.  The school must find that the "conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school."  *Id*. (internal quotation marks and citation omitted).

This Court applied *Tinker* in *Barber v. Dearborn Public Schools*, 286 F. Supp. 2d 847, 856 (E.D. Mich.2003), where a student was disciplined for wearing

16

a t-shirt critical of then President George W. Bush and, in *Glowacki*, where a student expressed his rejections of homosexuals based on his religious beliefs during a classroom discussion. 2013 WL 3148272, at *7. The Sixth Circuit similarly applied *Tinker* where students were disciplined for wearing t-shirts depicting a confederate flag when they did so "as both a commemoration of Hank Williams, Sr.'s birthday as well as a statement affirming the plaintiffs' shared southern heritage." *Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.*, 246 F.3d 536, 539-40 (6th Cir. 2001). The court thus concluded that the students intended to convey a particularized message, in other words engaged in viewpoint-specific speech. *Id.*

Quite a different scenario is presented when a student engages in "offensively lewd and indecent" speech. In *Bethel School District No. 403 v. Fraser*, the Supreme Court was presented with high school administrators' discipline of a student who, at a school assembly, gave "a lewd speech" in that he described the individual he was nominating for student elective office in terms of an "elaborate, graphic, and explicit sexual metaphor." 478 U.S. 675, 677, 106 S. Ct. 3159, 3161 (1986). Focusing more on the content of the nominating speech than its location, the *Fraser* Court held that the school "acted entirely within its permissible authority in imposing sanctions upon [the student] in response to his

17

offensively lewd and indecent speech." *Id*. at 685, 106 S. Ct. at 3165.

Distinguishing the case before it from *Tinker*, the Court reasoned:

> Unlike the sanctions imposed on the students wearing armbands in
> *Tinker*, the penalties imposed in this case were unrelated to any
> political viewpoint.  The First Amendment does not prevent the school
> officials from determining that to permit a vulgar and lewd speech
> such as respondent's would undermine the school's basic educational
> mission.  A high school assembly or classroom is no place for a
> sexually explicit monologue directed towards an unsuspecting
> audience of teenage students.  Accordingly, it was perfectly
> appropriate for the school to disassociate itself to make the point to
> the pupils that vulgar speech and lewd conduct is wholly inconsistent
> with the "fundamental values" of public school education.

*Id*. at 685-86, 106 S. Ct. at 3165.

The *Fraser* Court further reasoned that schools must be granted leeway to

evaluate what manner of speech, although appropriate in matters of adult public

discourse, is inappropriate in the school setting.  *Id*. at 682-83, 106 S. Ct. at 3164.

The Court explained:

> The First Amendment guarantees wide freedom in matters of adult
> public discourse.  A sharply divided Court upheld the right to express
> an antidraft viewpoint in a public place, albeit in terms highly
> offensive to most citizens [a jacket bearing the words "Fuck the
> Draft"].  *See Cohen v. California*, 403 U.S. 15, 91 S. Ct. 1780, 29
> L.Ed.2d 284 (1971).  It does not follow, however, that simply because
> the use of an offensive form of expression may not be prohibited to
> adults making what the speaker considers a political point, the same
> latitude must be permitted to children in a public school. . . . [T]he
> constitutional rights of students in public school are not automatically
> coextensive with the rights of adults in other settings.  As cogently

18

> expressed by Judge Newman, "the First Amendment gives a high
> school student the classroom right to wear Tinker's armband, but not
> Cohen's jacket."  *Thomas v. Board of Education, Granville School
> Dist.*, 607 F.2d 1043, 1057 (2d Cir. 1979) (opinion concurring in
> result).

*Fraser*, 478 U.S. at 682, 106 S. Ct. at 3164 (additional internal citations omitted).

According to the Court, schools have an obligation to do more than teach students

the curriculum; schools must teach students how to behave appropriately in a

civilized society:

> Surely it is a highly appropriate function of public school
> education to prohibit the use of vulgar and offensive terms in public
> discourse. Indeed, the "fundamental values necessary to the
> maintenance of a democratic political system" disfavor the use of
> terms of debate highly offensive or highly threatening to others.
> Nothing in the Constitution prohibits the states from insisting that
> certain modes of expression are inappropriate and subject to sanctions.
> The inculcation of these values is truly the "work of the schools."
> *Tinker*, 393 U.S., at 508, 89 S. Ct., at 737; see *Ambach v. Norwick*,
> [441 U.S. 68, 99 S. Ct. 1589 (1979)]. The determination of what
> manner of speech in the classroom or in school assembly is
> inappropriate properly rests with the school board.

> The process of educating our youth for citizenship in public
> schools is not confined to books, the curriculum, and the civics class;
> schools must teach by example the shared values of a civilized social
> order. Consciously or otherwise, teachers– and indeed the older
> students– demonstrate the appropriate form of civil discourse and
> political expression by their conduct and deportment in and out of
> class. Inescapably, like parents, they are role models. The schools, as
> instruments of the state, may determine that the essential lessons of
> civil, mature conduct cannot be conveyed in a school that tolerates
> lewd, indecent, or offensive speech and conduct such as that indulged

in by this confused boy.

*Id*. at 683, 106 S. Ct. at 3164.

Two years later, the Supreme Court in *Hazelwood* again espoused the role of

schools to shape students into civil citizens:

> A school must be able to set high standards for the student speech that
> is disseminated under its auspices– standards that may be higher than
> those demanded by some newspaper publishers or theatrical producers
> in the "real" world– and may refuse to disseminate student speech that
> does not meet those standards. In addition, a school must be able to
> take into account the emotional maturity of the intended audience in
> determining whether to disseminate student speech on potentially
> sensitive topics, which might range from the existence of Santa Claus
> in an elementary school setting to the particulars of teenage sexual
> activity in a high school setting. A school must also retain the
> authority to refuse to sponsor student speech that might reasonably be
> perceived to advocate drug or alcohol use, irresponsible sex, or
> conduct otherwise inconsistent with "the shared values of a civilized
> social order," *Fraser, supra*, 478 U.S., at 683, 106 S.Ct., at 3164, or to
> associate the school with any position other than neutrality on matters
> of political controversy. Otherwise, the schools would be unduly
> constrained from fulfilling their role as "a principal instrument in
> awakening the child to cultural values, in preparing him for later
> professional training, and in helping him to adjust normally to his
> environment." *Brown v. Board of Education*, 347 U.S. 483, 493, 74
> S.Ct. 686, 691, 98 L.Ed. 873 (1954).

*Hazelwood*, 484 U.S. at 272, 108 S. Ct. at 570.

While universities arguably may not bear the same responsibility as

elementary and secondary schools to act *in loco parentis*, *see, e.g., McCauley v.*

*Univ. of the Virgin Islands*, 618 F.3d 232, 242-47 (2010), universities undoubtedly

20

retain some responsibility to teach students proper professional behavior, in other words, to prepare students to behave and communicate properly in the workforce. *See, e.g., Ward v. Polite*, 667 F.3d 727 (6th Cir. 2011); *Tatro v. Univ. of Minnesota*, 816 N.W.2d 509, 520 (Minn. 2012). Moreover, the Sixth Circuit has recognized "the latitude educational institutions– at any level– must have to further legitimate curricular objectives." *Ward*, 667 F.3d at 733. The *Ward* court elaborated:

> All educators must be able "to assure that participants learn whatever lessons the activity is designed to teach." *Hazelwood*, 484 U.S. at 271, 108 S. Ct. 562. Just as a junior high school English teacher may fail a student who opts to express her thoughts about a once-endangered species, say a platypus, in an essay about *A Tale of Two Cities*, *see Settle*, 53 F.3d at 155, so a law professor may fail a student who opts to express her views about Salvador Dali and the fourth dimension in a torts exam. That the First Amendment protects speech in the public square does not mean it gives students the right to express themselves however, whenever and about whatever they wish on school assignments or exams. "A school need not tolerate student speech that is inconsistent with its basic educational mission." *Hazelwood*, 484 U.S. at 266, 108 S.Ct. 562.

*Id*.

To that end, in *Hazelwood* the Supreme Court granted schools particular leeway to restrict speech "which is an integral part of the classroom-teaching function of an educational institution." *Brown v. Li*, 308 F.3d 939, 950 (9th Cir. 2002). More exactly, the *Hazelwood* Court addressed "educator's authority over

21

school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271, 108 S. Ct. at 570. The Court held that "[e]ducators are entitled to exercise greater control over this . . . form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speakers are not erroneously attributed to the school." *Id.* "School-sponsored" speech may be restricted without offending the First Amendment provided the educator's "actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S. Ct. at 571.

In *Hazelwood*, the Court found that high school administrators did not run afoul of the First Amendment when they imposed restrictions on the publication of certain articles in a newspaper published by students in a journalism class. The Sixth Circuit applied the *Hazelwood* standard where high school administrators removed a student's name from the student council ballot in response to the student's "discourteous" and "rude" remarks about the high school's assistant principal during a speech at a school-sponsored assembly. *Poling v. Murphy*, 872 F.2d 757 (1989). The Sixth Circuit also found the *Hazelwood* standard appropriate

22

to analyze the decision of elementary school administrators to prevent a fifth grade student from selling candy canes with a religious card as part of a school project. *Curry ex rel. Curry v. Hensiner*, 513 F.3d 570 (6th Cir. 2008).

In the present case, Plaintiff argues that Defendants' actions must be analyzed under *Tinker*'s standard.  Defendants maintain that the Court must apply *Hazelwood*.  Neither standard, however, is the appropriate standard under the facts presented.  Plaintiff's lascivious entries about Mitzelfeld are not equivalent to the "pure speech" at issue in *Tinker*.  Plaintiff was not expressing his views on political, religious, or similar matters (including matters of a public concern).  In other words, he was not engaged in "pure speech."  On the other hand, the Court does not believe that Plaintiff's Daybook entries– which were to be reviewed by no one other than Mitzelfeld– are equivalent to the type of speech analyzed in *Hazelwood*.

*Hazelwood* involved speech that the Court described as (1) "school-sponsored", (2) part of the curriculum or serving curricular goals, and (3) "bear[ing] the imprimatur of the school."  484 U.S. at 270-71, 108 S. Ct. at 570.  Nothing in the Court's decision or the Sixth Circuit's discussion in *Ward* suggests that the *Hazelwood* Court was setting a standard to apply to *all* student expression that happens to occur in a curricular activity.  Rather, *Hazelwood* applies only

23

where the speech in question reasonably could be construed as representing the school's own viewpoint.  It is difficult to imagine that anyone would reasonably perceive Plaintiff's Daybook writings as bearing "the imprimatur of [OU]" or, as the Sixth Circuit has noted, "that an observer would reasonably perceive that the school approved the speech."  *Curry ex rel. Curry*, 513 F.3d at 577 and n.1 (providing that "[f]or speech to be perceived as bearing the imprimatur of the school does not require that the audience believe the speech originated from the school" and finding that students and parents reasonably would have perceived a student's sale of candy canes with a religious card as bearing the imprimatur of the school where products had to be approved by the school prior to sale and this fact was known to parents and students).  "The proposition that schools do not endorse everything that they fail to censor is not complicated." *Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 250, 110 S. Ct. 2356, 2372 (1990) (O'Connor, J., concurring). This Court then is left with the dilemma of which standard applies under the circumstances presented.

The Sixth Circuit's decision in *Settle v. Dickson County School Board*, 53 F.3d 152 (1995), provides guidance.  In *Settle*, a high school student brought a First Amendment challenge when her teacher refused to accept a research paper entitled "The Life of Jesus Christ" and gave her a "zero" for failing to write on

another subject. *Id*. at 153. The Sixth Circuit found no First Amendment violation

and therefore upheld the district court's grant of summary judgment to school

officials. The appellate court's opinion is quoted at length because it clarifies

which disputes arising in the school context raise legitimate free speech issues and

which do not warrant federal court review:

> After reviewing the precedents concerning students' rights of free speech within a public school, we find few cases that address the conflict between the student's rights of speech in the classroom and a teacher's responsibility to encourage decorum and scholarship, including her authority to determine course content, the selection of books, the topic of papers, the grades of students and similar questions. Students do not lose entirely their right to express themselves as individuals in the classroom, but federal courts should exercise particular restraint in classroom conflicts between student and teacher over matters falling within the ordinary authority of the teacher over curriculum and course content. "Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S. Ct. 266, 270, 21 L.Ed.2d 228 (1968).

> The free speech rights of students in the classroom must be limited because effective education depends not only on controlling boisterous conduct, but also on maintaining the focus of the class on the assignment in question. So long as the teacher violates no positive law or school policy, the teacher has broad authority to base her grades for students on her view of the merits of the students' work. *Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 98 S. Ct. 948, 55 L.Ed.2d 124 (1978); *Parate v. Isibor*, 868 F.2d 821, 828 (6th Cir. 1989) ("[t]he individual professor's assignment of a letter grade is protected speech.") . . .

25

> . . .Where learning is the focus, as in the classroom, student speech
> may be even more circumscribed than in the school newspaper or
> other open forum. So long as the teacher limits speech or grades
> speech in the classroom in the name of learning and not as a pretext
> for punishing the student for her race, gender, economic class, religion
> or political persuasion, the federal courts should not interfere.
>
> Like judges, teachers should not punish or reward people on the
> basis of inadmissible factors– race, religion, gender, political
> ideology– but teachers, like judges, must daily decide which
> arguments are relevant, which computations are correct, which
> analogies are good or bad, and when it is time to stop writing or
> talking. Grades must be given by teachers in the classroom, just as
> cases are decided in the courtroom; and to this end teachers, like
> judges, must direct the content of speech. Teachers may frequently
> make mistakes in grading and otherwise, just as we do sometimes in
> deciding cases, but it is the essence of the teacher's responsibility in
> the classroom to draw lines and make distinctions– in a word to
> encourage speech germane to the topic at hand and discourage speech
> unlikely to shed light on the subject. Teachers therefore must be given
> broad discretion to give grades and conduct class discussion based on
> the content of speech. Learning is more vital in the classroom than
> free speech.

53 F.3d at 155-56.

In her concurring opinion, Judge Alice Batchelder was more direct in stating

that the case did not raise First Amendment concern.  *Id*. at 156-59.  Judge

Batchelder wrote:

> Although I do not think that the facts in regard to this claim are as
> clear as the majority opinion portrays them as being, the *material* facts
> are clear, those facts are not in dispute, and those facts do not state a
> First Amendment claim. This case is not about Brittney Settle's First
> Amendment right to express her views, opinions or beliefs, religious

26

or otherwise, in the classroom. This case is about whether Brittney's ninth-grade English teacher may determine what topic is appropriate to satisfy a research paper assignment in that class.

* * *

In my view, these facts simply do not state a constitutional claim. Ms. Ramsey was not engaged in restricting Brittney's expression. She was engaged in restricting Brittney's choice of topic for a research paper. Brittney does not expressly claim that a classroom teacher cannot control the subject matter for such assignments without violating the students' rights of expression. Rather, she claims that the restrictions on this assignment were so loose that her choice of topic fit the assignment, and that Ms. Ramsey refused to permit her to use that topic because the topic was religious. Brittney bolsters her claim by asserting that Ms. Ramsey's reasons for refusing to permit the topic were obviously pretextual.

I would agree that some of Ms. Ramsey's after-the-fact reasons are not very convincing. And I do not agree with the majority's finding that there is no basis in the record for a claim that Ms. Ramsey was not truthful in stating those reasons. More importantly, however, I do not think that Ms. Ramsey's after-the-fact statement of reasons, even if those reasons were pretextual, were pretexts for suppressing Brittney's expression. They were pretexts for an error in judgment. The one thing which this record demonstrates clearly is that what Ms. Ramsey was guilty of was failing to provide this ninth-grade class with substantive guidelines for choosing their research paper topics. Faced with Brittney's new and unapproved topic, Ms. Ramsey realized that the criteria that she had in mind, but had not adequately explained to the class, limited the acceptable topics well beyond the general criteria of "interesting, researchable and decent."

*Id*. at 157. In short, Judge Batchelder did not join the majority opinion simply because she found its First Amendment analysis unnecessary:

A research paper is not an expression of opinion, and the restriction of

27

choice of topic is not readily analogous to the kind of pure expression of student opinion, that happened to take place in the classroom, that the Supreme Court addressed [in *Tinker*].

* * *

The bottom line is that when a teacher makes an assignment even if she does it poorly, the student has no constitutional right to do something other than that assignment and receive credit for it. It is not necessary to try to cram this situation into the framework of constitutional precedent, because there is no constitutional question.

*Id*. at 158.

The sanctions OU imposed on Plaintiff in response to his Daybook entries undoubtedly are harsher than the "zero" the plaintiff in *Settle* received on her essay assignment. However, like the Sixth Circuit in *Settle*, this Court does not believe that it should interfere and assess the appropriateness of the school's punishment where First Amendment expression was not involved.

Plaintiff's expressions of lust for Mitzelfeld or descriptions of her physical appearance are not entitled to First Amendment protection. "Self-expression is not to be equated to the expression of ideas or opinions and thus to participation in the intellectual marketplace." *Brandt v. Bd. of Educ. of City of Chicago*, 480 F.3d 460, 465 (7th Cir. 2007). As such, Defendants do not invoke curriculum as a pretext for engaging in unlawful discrimination, as the Sixth Circuit found was possibly the case in *Ward*. It matters not whether Plaintiff's Daybook writings satisfied the

28

legal definition of obscenity or sexual harassment.  Defendants reasonably could have found his writings inappropriate from a student to a teacher (as they certainly would have been from a teacher to a student) and punished him accordingly. Perhaps some would view Defendants' punishment as disproportionate to Plaintiff's conduct.  Perhaps, however, Defendants believed the sanctions were necessary to emphasize to Plaintiff that, although arguably acceptable in a karaoke bar, certain behaviors when directed at female professors, fellow students, or future co-workers are not tolerable in a civilized society. Nevertheless, Defendants' reasons for exacting the sanctions imposed on Plaintiff are irrelevant, as the Court concludes that his First Amendment rights were not violated under the facts alleged.  "'Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values.'"  *Settle*, 53 F.3d at 155 (quoting *Epperson*, 393 U.S. at 104, 89 S. Ct. at 270).

As such, the Court concludes that Plaintiff's claims alleging First Amendment retaliation (Count 1), Fourteenth Amendment Equal Protection Clause violations (Count 2), and viewpoint discrimination (Count 4) are dismissed pursuant to Rule 12(b)(6).

### B.      Overbreadth and Vagueness Challenges to Regulation 6.02[4]

In his third cause of action, labeled "Violation of Plaintiff Corlett's Right to Freedom of Expression and Due Process of Law", Plaintiff alleges that Regulation 6.02 is vague and thereby allowed Defendants to enforce the policy in a discriminatory and arbitrary manner against Plaintiff's protected expression and conduct.  (*See* Compl. ¶ 93.)  Although recognizing that there are "long-established legal definitions" of the conduct prohibited in Regulation 6.02 (i.e. intimidation, harassment, threats, and assault) (*see id.* ¶ 98), Plaintiff alleges that "Defendants have conditioned compliance with the Unlawful [Individual] Activities Policy on the subjective emotional experience of the listener" and that "[t]his policy has limited and prohibited constitutionally-protected speech and conduct without providing any published, objective, and definitive guidelines by which Plaintiff Corlett and other students can guide their behavior."  (*Id.*)  Plaintiff's fourth cause of action similarly alleges that Regulation 6.02 is unconstitutional in that it is overbroad when not limited to the legal definitions of the conduct prohibited.  (*Id.*

_____

[4]In their motion to dismiss, Defendants contend that Plaintiff's conduct also constituted sexually discriminatory conduct prohibited by OU's Discriminatory Harassment policy.  (Def.'s Br. in Supp. of Mot. at 2, ECF No. 12.)  In response, Plaintiff argues that this policy also is unconstitutional.  (Pl.'s Resp. Br. at 17, ECF No. 16.)  OU did not cite this policy in disciplining Plaintiff and Plaintiff's Complaint neither mentions nor challenges the policy.  The Court, therefore, is focusing only on Regulation 6.02.

30

¶ 113.)

To the extent Plaintiff is alleging in these counts that Regulation 6.02 has been applied unconstitutionally, his claims fail for the reason discussed above– i.e., he was not disciplined for engaging in protected speech. The Court believes that his Complaint could be construed as alleging that the regulation, on its face, is overbroad and vague and therefore unconstitutional. In the event that is Plaintiff's claim, the Court addresses it below.[5]

The Sixth Circuit has outlined a step-by-step approach for analyzing an overbreadth claim. *Dambrot v. Central Michigan Univ.*, 55 F.3d 1177, 1182-83 (1995). First, the court must "'determine whether the regulation reaches a substantial amount of constitutionally protected speech.'" *Id*. at 1182 (quoting

---

[5]The Court has some concern as to whether Plaintiff has standing to challenge the Regulation if it was not applied to stifle *his* protected expression. An individual has standing to challenge the constitutionality of a statute "if he or she can demonstrate a realistic and credible threat of enforcement." *Doe v. Univ. of Michigan*, 721 F. Supp. 852, 859 (E.D. Mich. 1989) (citing *Steffel v. Thompson*, 415 U.S. 452, 94 S. Ct. 1209 (1974)). "The mere possibility that a person might be subject to the sanctions of a statute is insufficient." *Id*. (citing *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984)). "[T]he threat of enforcement must be specific and direct and against a particular party." *Id*. (citing *Houston v. Hill*, 482 U.S. 451, 459 n.7, 107 S. Ct. 2502, 2508 n.7 (1987)). Plaintiff alleges that "[b]ecause of the University's onerous Unlawful [Individual] Activities Policy and intolerance of any students who dissent from its politically correct orthodoxy, Plaintiff Corlett is unable to engage in a full range of dialogue on matters of legitimate political, cultural, and/or social concern." (Compl. ¶ 64.) Plaintiff's Complaint, however, is devoid of any facts suggesting that Regulation 6.02 poses a "realistic and credible threat" of chilling students' speech on matters of *legitimate* political, cultural, and/or social concern.

*Leondardson v. City of E. Lansing*, 896 F.2d 190, 195 (6th Cir. 1990)).  Next, the court must "determine whether the policy is 'substantially overbroad and constitutionally invalid under the void for vagueness doctrine.'"  *Id*. at 1183 (quoting *Leondardson*, 896 F.2d at 195).  A regulation may be unconstitutionally vague if it "'denies fair notice of the standard of conduct to which a citizen is held accountable'" or if it "'leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement.'"  *Id*. at 1183-84 (quoting *Leonardson*, 896 F.3d at 195-96).

Plaintiff challenges the final clause of Regulation 6.02 that reads: "nor shall any person in any way intimidate, harass, threaten or assault any person engaged in lawful activities on campus."  As Plaintiff acknowledges in his Complaint, the terms "intimidate", "harass", "threaten", and "assault" each have "long-established legal definitions."  (Compl. ¶¶ 94-98.)  On its face, therefore, Regulation 6.02 does not "sweep within its ambit a substantial amount of [constitutionally] protected speech," and provides fair notice of what conduct is prohibited thereunder. Plaintiff does not allege any facts in his Complaint to suggest that Regulation 6.02, like the University of Michigan policy at issue in *Doe*, has been interpreted to reach constitutionally protected conduct.  *See Doe*, 721 F. Supp. at 865-66 (setting forth instances where the university's anti-harassment policy was applied to

32

students' protected speech).

The Court therefore concludes that Plaintiff's vagueness and overbreadth challenges to Regulation 6.02 also are subject to dismissal.

## VI.    Conclusion

The Court concludes that Plaintiff's Daybook entries, written as part of his OU English 380 course assignment, are not protected by the First Amendment. Perhaps the expressions therein would be entitled to constitutional protection if Plaintiff had made them to the neighbor described in his "My Boobs DVD" essay or the woman at the karaoke bar described in his "Revenge Karaoke" essay. However, speech protected in other settings is not necessarily protected when made in response to a classroom assignment and when directed at one's professor. Thus the Court holds as a matter of law that Defendants did not violate Plaintiff's First Amendment rights when they disciplined him in response to those writings. As such, to the extent based on the application of Regulation 6.02 to his speech, Plaintiff's challenges to OU's policy also are subject to dismissal. The Court also concludes that the policy, on its face, is not void as overbroad or vague.

Accordingly,

**IT IS ORDERED**, that Defendants' Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) is **GRANTED**.

Dated: July 23, 2013                    s/PATRICK J. DUGGAN
                                        UNITED STATES DISTRICT JUDGE

Copies to:
Leonard M. Niehoff, Esq.
Sean F. Crotty, Esq.
Alari K. Adams, Esq.
Kyle J. Bristow, Esq.